[Cite as *State v. Wilson*, 2012-Ohio-1505.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 11 MA 92 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | O P I N I O N |
| | ) | |
| ROBERT WILSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:   Criminal Appeal from Common Pleas
                    Court, Case No. 92CR787.


JUDGMENT:           Affirmed.


APPEARANCES:
For Plaintiff-Appellee:       Attorney Paul Gains
                    Prosecuting Attorney
                    Attorney Ralph Rivera
                    Assistant Prosecuting Attorney
                    21 West Boardman Street, 6th Floor
                    Youngstown, Ohio 44503


For Defendant-Appellant:      Attorney Jana DeLoach
                    P.O. Box 2385
                    Akron, Ohio 44309


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro

                    Dated: March 30, 2012

VUKOVICH, J.

{¶1} Defendant-appellant Robert Wilson appeals from the Mahoning County Common Pleas Court's decision denying his Crim.R. 33 Motion for Leave to file a Delayed Motion for New Trial. Wilson asserts the affidavits attached to the motion establish by clear and convincing evidence he was unavoidably prevented from discovering the new evidence. The state disagrees claiming that the time from discovery of the information to the filing of the motion was unreasonable. For the reasons expressed below, the judgment of the trial court is hereby affirmed.

## STATEMENT OF THE FACTS AND CASE

{¶2} In October 1993 Wilson was convicted of murdering his estranged wife, Tonya Wilson, in violation of R.C. 2903.02, a first-degree felony; unlawful possession of a dangerous ordnance, in violation of R.C. 2923.17(A)(C), a fourth-degree felony; and, for having weapons while under disability, in violation of R.C. 2923.13, a fourth-degree felony. In early 2008, Wilson filed a motion with this court asking permission to file a delayed direct appeal, which was granted. On December 21, 2009, we issued our decision affirming the conviction. We summarized the facts and evidence offered at trial as follows:

{¶3} "Tonya was killed on July 21, 1992, shortly before 1:00 a.m., by a bullet that entered the back of her neck while she was sitting in her station wagon on Stansbury Drive in the Hill Housing Projects on the north side of Youngstown. (Tr., p. 107.) Five eye-witnesses provided testimony at trial to establish the events preceding Tonya's death.

{¶4} "According to Tonya's housemate, Kim Kellar Magboo, she and Tonya took Tonya's children to Darlene Walker's house on Stansbury that evening so that she and Tonya could go to a friend's house. (Tr., pp. 120-122.) When they arrived, Walker asked Tonya if she would take her to Whistle's, a local bar, while Magboo watched the children. (Tr., p. 121.)

{¶5} "Approximately twenty minutes later when Tonya and Walker returned, Magboo sat with Tonya in her station wagon while Magboo smoked a cigarette. (Tr.,

p. 109.) She testified that the front passenger's side window was rolled down in order to let the smoke out of the car. (Tr., p. 114.)

{¶6} "Shortly after Magboo got out of the car and walked over to Tonya's window, Appellant turned the corner onto Stansbury in his gray Delta 88 and rear-ended the station wagon. (Tr., p. 110.) According to his voluntary statement to the police, Appellant saw Tonya at Whistle's, and ordered her to pick up her children and go home. (07/21/992 Statement of Robert E. Wilson, pp. 1-2.) Appellant was angry with Tonya because she had promised to pick him up with his children at his mother's house that evening, but she did not fulfill her promise.

{¶7} "After rear-ending the station wagon, Appellant exited the Delta 88, slapped Tonya, and told her to 'go home.' (Tr., pp. 109-110.) In response, she tried to hit Appellant with the station wagon. (Tr., p. 111.) Then she turned the station wagon around and rammed the front-end of the Delta 88. Appellant got back in his car and drove into the station wagon. This back and forth battle with the automobiles continued for some time.

{¶8} "Apparently, Tonya's children were standing outside of Walker's apartment, because Magboo testified that she lost sight of Tonya and Appellant while she was trying to get the children into the house. (Tr., pp. 111-112.) LaCarra Peterson, Tonya's daughter, remained outside. (Tr., p. 128.)

{¶9} "Tonya began to drive down the street in reverse, but Appellant gave chase and continued ramming into the front end of the station wagon. (Tr., p. 111.) According to Magboo, Appellant was pushing Tonya's car down the street with his automobile. (Tr., p. 129.) At some point, her car 'went sideways and hit another car.' (Tr., p. 112.) Then, Magboo heard gunshots.

{¶10} "She testified that she saw two sparks come out of the front driver's-side window of Appellant's car, but she heard three gunshots. She testified that the first two shots were close together, and the third shot occurred approximately five seconds later. (Tr., p. 115.) She further stated that the third gunshot was "further away" than the first two gunshots . Finally, she stated that she was close to Tonya's car when she heard the third gunshot. When Magboo reached the station wagon, she discovered

that Tonya had been shot.  (Tr., p. 113.)  The rear driver's-side window of the station wagon was shattered.  (Tr., p. 288.)

**{¶11}** "When Appellant was apprehended at his home, he denied shooting at Tonya.  The police searched Appellant's car, but the only weapon they recovered was an Intratec 9 millimeter semi-automatic gun.  (Tr., pp. 277-278.)  Testimony at trial established that the Intratec was not the murder weapon.  (Tr., pp. 784, 975.)  Magboo testified that Appellant 'carrie[d] around' the Intratec, but she also had seen him with a laser-sighted gun.  (Tr., pp. 116-118.)  However, no other weapon belonging to Appellant was ever recovered by the police.

**{¶12}** "Joseph Oliver, an off-duty security guard, testified that he saw Appellant's vehicle ram into Tonya's car, and he witnessed Tonya's attempts to hit Appellant with her car.  He testified that Appellant continued to ram into Tonya's station wagon as she drove backwards down the street.  (Tr., p. 156.)

**{¶13}** "According to Oliver's direct testimony, he heard gunfire and went to the driver's-side door of his car to retrieve his handgun, a .357 Smith and Wesson, to protect himself.  (Tr., p. 157.)  He testified that he saw a gun flash come from Appellant's car, and then the station wagon started swerving and collided with a black Mustang which was parked by his car.  Appellant's car crashed into the station wagon, which forced the station wagon into Oliver's car.  (Tr., p. 158.)

**{¶14}** "Oliver admitted that he fired two shots into the air, and shouted, '[g]et the fuck out of the way.'  (Tr., p. 157.)  He claimed that he was yelling at Appellant and Tonya, 'because [he] didn't know what was going on.'  He testified that Tonya appeared 'dazed' when he caught sight of her immediately after firing his handgun.  (Tr., pp. 157-158, 169.)  While Appellant fled the scene Oliver called the police.  (Tr., p. 159.)  Oliver then left the area because he feared that Appellant would return.  (Tr., p. 223.)

**{¶15}** "On cross-examination, Oliver conceded that it was not the sound of gunfire that prompted him to retrieve his handgun.  (Tr., p. 208.)  He admitted that he grabbed the gun because he was afraid that Tonya was going to crash into his car.  Oliver testified that he did not see a laser sight emitting from Appellant's car that night.

(Tr., p. 218.)  He conceded that he did not include the fact that he saw a gun flash or a gun in his statement to the police immediately following the incident.  (Tr., p. 253.)

{¶16} "Derrick Davis was also a witness to the events of July 21, 1992.  He was talking with Oliver on the sidewalk when they saw Appellant's car turn onto Stansbury.  (Tr., pp. 568-570.)  However, Davis did not remember the specific events that ultimately led to Tonya's death.  The state first attempted to refresh Davis' recollection by instructing him to read the statement he gave to the police on July 21, 1992.  When the statement failed to refresh Davis' recollection, the trial court permitted the state to read his statement into the record, pursuant to Evid. R. 803(5), the recorded recollection exception to the hearsay rule.  (Tr., p. 579.)

{¶17} "According to Davis' statement to the police, while Tonya's station wagon was backing up and swerving back and forth, Davis heard a gunshot.  (Tr., p. 587.)  The gray Delta 88 hit the station wagon hard, and the station wagon spun backwards into the black Mustang then into Appellant's car.  In his statement, Davis said:

{¶18} "'I took off, and I observed [Oliver] fire two rounds into the air.  I got to the top of the hill, and the guy in the Delta backed up Stansbury.  I ran back down to the girl's station wagon. I saw her drop her head, and I knew she was hurt.  I then went and called the ambulance.'  (Tr., p. 587.)

{¶19} "After making his statement on July 21, 1992, he was asked if he had anything to add.  He responded, 'I saw the girl was looking over her shoulder while she was backing down the street.  I never saw the man in the Delta's (gray) face.'  (Tr., p. 587.)

{¶20} "After reading Davis' statement into the record, the prosecutor asked Davis whether he could identify the type of handgun that was used by the man in the gray Delta 88.  Appellant's counsel objected to the question, because Davis' statement did not establish that he saw a handgun that evening.  The trial court overruled the objection, and Davis testified that he did not see a weapon, and also that he could not remember if he saw a weapon.  (Tr., p. 588.)

{¶21} "* * *

{¶22} "The prosecutor asked Davis if the man in the gray Delta 88 had a gun in his hand outside of the driver's-side window.  Davis responded, '[y]eah.'  Although

Davis stated that the gun was pointed in the direction of Tonya's neck, and that she was turned to her left while she was backing down the street in his September 18, 1992 statement, he could not recall these facts at trial. (Tr., p. 604.) Davis testified that Oliver was pointing his gun up in the air when he fired it, and that he did not fire into Tonya's car. Davis further testified that before he ran off, he heard one gunshot come from the gray Delta 88.

{¶23} "Finally, when he was asked if he saw the person in the gray car with, 'what [he] called a chrome gun,' he answered '[y]es.' (Tr., p. 605.) In his September 18, 1992 statement, Davis claimed to have seen the man in the Delta 88 with a chrome gun. The prosecutor then asked if a chrome gun is different than a Tec-9, which is a black gun, and Davis answered, '[r]ight.' (Tr., p. 605.)

{¶24} "On cross-examination, Davis conceded that he did not mention that he saw a gun in his July 21, 1992 statement. (Tr., p. 607.) He conceded that he did not know the origin of the gunshot, nor could he identify what the sound was when he heard it. (Tr., p. 609.) However, he did not waiver with respect to having seen something chrome outside of the driver's-side window of the gray Delta 88. (Tr., pp. 613-614.)

{¶25} "* * *

{¶26} "The fourth eyewitness, LaCarra Peterson, who was seven years old when she testified at trial, provided a markedly different account of her mother's death. Peterson was standing on Walker's porch at the time of the incident. (Tr., p. 83.) She testified that Appellant bumped into her mother's car, and that her mother 'went back and ran into his car.' (Tr., p. 67.) According to Peterson, Tonya got out of her car and walked up to Appellant's car. (Tr., p. 68.) Appellant bumped Tonya's car a second time, and then Tonya bumped Appellant's car. (Tr., p. 69.)

{¶27} "Peterson testified that Appellant got out of his car and, '[t]hey all went back to [her] mother's car.' (Tr., p. 69.) At some point, after the cars had traveled down the street, Peterson testified that Appellant walked behind Tonya's car with a gun. (Tr., pp. 71-72.) She described the gun as being black with a 'red dot on it.' (Tr., p. 73.) At first, she testified that she had never seen the gun prior to that evening, but later she stated that she remembered Appellant putting the gun to the head of one of

her mother's friends, as well as pointing it at her mother and Magboo.  (Tr., p. 75.) Finally, she testified that Appellant walked around the back of her mother's car, shot at her mother and missed, and then shot her in the neck.  (Tr., pp. 77, 89.)

{¶28} "She conceded on cross-examination that it was dark that evening and that Appellant and Tonya were farther away than the back of the courtroom when the shooting occurred.  (Tr., p. 86.)  She also stated that her mother's car had crashed into a brown car, but that there were no people around the brown car.  (Tr., p. 88.) According to Peterson, Appellant shot her mother from behind the car.  (Tr., p. 92.)

{¶29} "On redirect, Peterson testified that Appellant shot her mother 'from the trunk.'  (Tr., p. 94.)  She heard two shots.  (Tr., p. 96.)  On re-cross, Peterson conceded that she claimed to see a gun in Appellant's hand when he first arrived at Walker's house in her statement to police (which was taken a year after Tonya's death), but that she testified at trial that the first time she saw the gun was after Appellant and Tonya traveled down the street.  (Tr., p. 100.)  She was not, at that point, certain which statement was correct.

{¶30} "Peterson's testimony regarding the origin of the gunshots was corroborated by Donnie Barnette, the owner of the black Mustang.  Barnette was sleeping at her mother's home in a first floor bedroom on the opposite side of Stansbury when she was roused by a loud crash.  (Tr., pp. 259, 261.)  When she looked out the window she 'saw a gunshot so [she] got out the window.'  (Tr., p. 260.) She testified that the gunshots were coming from behind her Mustang.  She further testified that when she saw 'a light coming from the gun,' she moved away from the window.  (Tr., p. 261.) She heard three or four gunshots.  The day following the shooting, Barnette testified that her mother discovered two bullet holes in the building. (Tr., p. 265.)

{¶31} "The lion's share of the testimony of the state's firearms examiner expert, Richard Turbok, involved the analysis of two bullet fragments: the fragment removed from Tonya's jaw and a bullet jacket, with hair attached, found on the front seat of the station wagon.  (Tr., pp. 290-291.)  There was some testimony at trial regarding a third bullet, which was pulled from a screen door at the crime scene, but rust around the bullet suggested that it was not fired on the night in question.  (Tr., pp. 329, 795, 977.)

{¶32} "Although Turbok conceded that the fragments provided for analysis, ;did not show any type of good, unique working detail,; he concluded that the bullet that killed Tonya was a .38 caliber jacketed bullet.  (Tr., pp. 779-780, 804.)  He further concluded that the weapon that fired the fatal bullet was a .38 caliber or .357 Magnum caliber, with five lands, five grooves, and a right hand twist, based upon the rifling class characteristics on the bullet jacket found next to Tonya in her car.  (Tr., p. 785.)  However, he could not state with a reasonable degree of scientific certainty that the bullet fragment in Tonya's jaw and the bullet jacket found in the station wagon were two parts of the same bullet.  (Tr., p. 812.)

{¶33} "Turbok testified that, although the weapon used to kill Tonya shared the same class characteristics as Oliver's handgun, the unique detail and the lands were different.  (Tr., p. 791.)  Based upon microscopic detail on the bullet jacket, Turbok testified that Oliver's gun did not kill Tonya.  (Tr., p. 791.)  He also relied on the fact that the remaining unfired cartridges in Oliver's gun were non-jacketed.  (Tr., p. 793.)  He testified that the non-jacketed rounds are semi-wadcutter bullets, often called 'reloads,' and are considerably less expensive than jacketed bullets.  (Tr., pp. 793-794.)

{¶34} "Larry Dehus, a forensic scientist employed by Law-Science Technologies, testified for the defense somewhat differently.  He stated that the bullet fragment in Tonya's jaw, which he characterized as the 'core,' and the bullet jacket found in the station wagon were two parts of the same bullet.  (Tr., pp. 920-921.)  He said that the core contained trace amounts of glass particles, and the bullet jacket contained trace amounts of red paint.  (Tr., p. 922.)  Although he could not account for the red paint, he theorized that the glass particles 'could have' come from the shattered driver's side rear window.  (Tr., p. 926.)  He conceded, however, that he did not examine Tonya's car because it was not impounded, (Tr., p. 972), nor did he contact the automobile manufacturer to compare the glass particles to the type of glass used for that model year in the station wagon.  (Tr., p. 973.)

{¶35} "Based on a test-fired round from a .357 handgun provided by the police department, Dehus concluded that the bullet fired from the .357 shared the same class characteristics as the bullet that killed Tonya.  (Tr., p. 927.)  Dehus conceded,

however, that class characteristics narrow a piece of evidence by group, but do not 'individualize' a piece of evidence. (Tr., p. 917.) He explained that he was unable to test fire Oliver's handgun, because he was told that it had been released by the police department following the completion of its investigation. (Tr., p. 929.)

{¶36} "An Atomic Absorption test was performed on Appellant on July 21, 1992, to determine if he had recently fired a gun. Dr. Freidrich Koknat explained that the test is conducted to ascertain the existence of barium and antimony on hands and clothing. (Tr., pp. 489, 493.) Both substances must be present in a particular quantity in order to conclude the existence of gunshot residue. (Tr., p. 494.)

{¶37} "Koknat examined towels taken from Appellant's car, but he did not find a sufficient amount of antimony to find the presence of gunshot residue. He also examined a jacket belonging to Appellant upon which he found sufficient quantities of barium and antimony on the right sleeve to constitute gunshot residue. (Tr., p. 497.) There were also smaller amounts on the left sleeve and on the front and back of the jacket, which Koknat attributed to transfer from the jacket being removed and folded.

{¶38} "Appellant's right palm, which was tested approximately one hour and twenty minutes after the shooting, also tested positive for the requisite amounts of barium and antimony. (Tr., pp. 498-499.) The quantity of antimony found on Appellant's left palm, and the back of his right hand was not sufficient to be consistent with gunshot residue. (Tr., p. 500.) Appellant told Detective David McKnight he had fired his gun five days before the incident. (Tr., p. 715.)" *State v. Wilson*, 7th Dist. No. 08MA51, 2009-Ohio-7012, ¶ 3-40.

{¶39} While the appeal was pending, Wilson filed a Motion for Leave to File a Crim.R. 33 Motion for New Trial. 06/12/09 Motion. The motion asserts that Wilson was unavoidably prevented from discovering the new evidence within the time allowed by Crim.R. 33. The newly discovered evidence relates to an alleged confession of Joseph Oliver stating that he believed he killed Tonya and one eye witness, Doretha Dickerson, who also stated that Oliver killed Tonya. As the above recitation of the evidence admitted at trial shows, Dickerson was not called as a witness. An affidavit from defense counsel is attached to the Motion for Leave which avers that he was

unaware of Dickerson's observance of the shooting despite having canvassed the area for witnesses and having knocked on 10-12 apartment doors in the area.

{¶40} The state filed a motion in opposition to the Motion for Leave. 07/07/09 Motion. The trial court did not immediately rule on Wilson's motion following our appellate decision, therefore, Wilson filed another motion renewing his motion for a new trial. 05/06/11 Motion. Four days later the trial court ruled on the motion, denying Wilson leave to file a motion for new trial. 05/10/11 J.E. The trial court reasoned that "because Defendant failed to establish by clear and convincing proof that he was unavoidably prevented from discovering the evidence upon which he relied. See Crim.R. 33(B)." 05/10/11 J.E. Wilson timely appeals from that order.

ASSIGNMENT OF ERROR

{¶41} "THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING THE APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL."

{¶42} Wilson's new trial motion is based on newly discovered evidence. Crim.R. 33(B) provides that motions for new trial based on newly discovered evidence must be filed within 120 days after the jury verdict was rendered. The rule, however, provides a mechanism for petitioners who discover the evidence outside the 120 day period; an offender is to file a motion requesting leave to file a motion for new trial. *State v. Parker,* 178 Ohio App.3d 574, 2008-Ohio-5178, 899 N.E.2d 183 (2d Dist.) ¶ 16. In such a motion, the petitioner must show by clear and convincing proof that the evidence that he is relying on to support his motion for new trial could not have been discovered within the 120 day period. Crim.R. 33(B). "[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *Id.*, quoting *State v. Walden*, 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859 (10th Dist.1984). If such motion for leave is granted, the motion for new trial must be filed within seven days of that order. Crim.R. 33(B).

**{¶43}** In 2009, Wilson requested leave to file a motion for new trial. The request for a new trial was made outside the 120 day period allowed by Crim.R. 33(B). The trial court denied that leave.

**{¶44}** We review the trial court's denial of a Crim.R. 33(B) motion for leave to file a motion for new trial under an abuse of discretion standard of review. *State v. Pinkerman*, 88 Ohio App.3d 158, 160, 623 N.E.2d 643 (4th Dist.1993). Thus, unless we find that the court's attitude was unreasonable, arbitrary or unconscionable, we must affirm the court's decision. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶45}** Attached to the motion are four affidavits that Wilson asserts support his position that he is entitled to a new trial based on newly discovered evidence. The first affidavit is signed by three Youngstown Police Officers and was notarized on March 14, 2006. In this affidavit the officers aver that on March 6, 2006, Billy Oliver, Joseph Oliver's brother, told the officers that Joseph told Billy, "I think I killed that girl [Tonya Wilson] because I fired my gun in the air." Billy stated that he had the bullets from Joseph's gun and he would bring them to the officers. Billy also told the officers that he went to see Wilson's attorney "and told him the story but he was told to come back." The affidavit indicates that Joseph Oliver is deceased.

**{¶46}** The second affidavit is from Joseph Oliver's mother, Reverend Ms. Oliver. It was signed and notarized on October 24, 2008. Ms. Oliver attests that Joseph told her, "I think I shot that girl [Tonya Wilson]." She indicated that she does not remember the date he made the statement but she heard him make it.

**{¶47}** The third affidavit is from Doretha Dickerson. This affidavit is dated November 25, 2008. She avows that she witnessed Joseph Oliver shoot Tonya Wilson. She states that Oliver shot straight forward toward Tonya Wilson's car, not in the air.

**{¶48}** The last affidavit is from Attorney Dennis A. DiMartino, trial counsel for Wilson. This affidavit is signed on April 22, 2009. He attested:

**{¶49}** "7. I returned to the crime scene several times during the case and spoke to other persons who lived or were present in the area of the actual shooting on the night in question. During all of these times, I never heard the name of Dorothea

Dickerson as being a person who witnessed the shooting. Although I canvassed the neighborhood and knocked on 10-12 apartment doors, I never met or spoke to Dorothea Dickerson.

**{¶50}** "8. If I had known that Dorothea Dickerson witnessed Tonya Wilson being shot, I would absolutely have interviewed her and called her as a defense witness. I would want to see if she could testify that the gun fire came from the sidewalk behind Tonya's car, where Joe Oliver was standing <u>or</u> whether it came from Rob Wilson's car, which was directly in front of Tonya's car.

**{¶51}** "9. Tonya Wilson's daughter testified at the Trial that the gunfire came from the sidewalk behind Tonya's car, but given the fact that she was young and more than 100' feet away from the shooting her testimony was discounted by the Jury. If we had an independent witness such as Dorothea Dickerson to corroborate that the gunfire came from the sidewalk, I think it would have resulted in an acquittal instead of a conviction. In other words, if I knew about Dorothea Dickerson back in 1994, Rob Wilson might never have gone to prison."

**{¶52}** However, in that same affidavit Attorney DiMartino admitted that ballistics tests proved that Joseph Oliver's pistol, that Oliver claimed was the one he fired that night, did not kill Tonya Wilson.

**{¶53}** At trial, Wilson admitted to being there on the night of the shooting. However, his position was that it was impossible given the angle of the fatal shot that he was the shooter. He contended that Joseph Oliver was the shooter of the fatal shot; this position is apparent from the argument made during closing arguments. (Tr. 1116-1117). Thus, the affidavits add further evidence to the theory of the crime purported by Wilson. Our sister district has concluded that additional evidence of a theory of a crime is considered "new" evidence for purposes of a Crim.R. 33 motion for a new trial. *State v. Gillispie*, 2d Dist. Nos. 22877 and 22912, 2009-Ohio-3640, ¶ 138.

**{¶54}** However, since the motion for new trial was being filed outside the 120 day period there must be a showing that Wilson had no knowledge of information contained in the affidavits and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence.

**{¶55}** While the motion and the brief assert that the information concerning Joseph Oliver admitting to shooting the fatal shot and an eye witness being uncovered just recently came available, neither provides a reason for why this information could not have been obtained within the 120 day period through due diligence. Admittedly, the affidavits are dated March 6, 2006; October 24, 2008; November 25, 2008 and April 22, 2009. However, an affidavit signed outside Crim.R. 33's 120 day time limit does not necessarily offer clear and convincing proof that the movant was unavoidably prevented from obtaining the evidence within the time limit. *State v. Shakoor*, 7th Dist. No. 10MA64, 2010-Ohio-6386, ¶ 21; *State v. Jackson,* 3d Dist. No. 14-04-11, 2004-Ohio-5103, ¶ 8-9; *State v. Williams,* 12th Dist. No. CA2003-01-001, 2003-Ohio-5873, ¶ 21; *State v. Fortson,* 8th Dist. No. 82545, 2003-Ohio-5387, ¶ 11. The burden is on the petitioner to show how he was unavoidably prevented from timely discovering the evidence; the court is "not required to make suppositions about the reasons for the delay." *Fortson*, at ¶ 12. Thus, the use of an affidavit signed outside the time limit for a timely motion that fails to offer any reason why it could not have been obtained sooner is not adequate to show by clear and convincing proof that the evidence could not have been obtained within the prescribed time period. *Id.*

**{¶56}** Therefore, without an explanation as to why the information could not have been obtained sooner, we only have the information in the affidavits to determine whether they could or could not have been obtained sooner. The information in the affidavits does not clearly provide why the information could not have been obtained sooner. For instance, while the affidavit from the Youngstown Police Officers was made within days of Billy Oliver making the statement to the officers, the affidavit itself does not contain information as to why the information in it could not have been obtained sooner. The affidavit does not contain the information of when Joseph Oliver made the statement concerning the shooting to Billy Oliver, nor does it contain information as to when Joseph Oliver died. Had Joseph Oliver recently died but the statement was made years prior to that it may be understandable why Billy Oliver would not want to implicate his brother in the death. Similarly, it is unclear why the affidavit from Joseph Oliver's mother could not have been obtained sooner. Once it became known that Joseph Oliver allegedly made statements that he thought he shot

Tonya Wilson, the information was known to Wilson and he could have sought out other information to implicate Oliver. This would especially be the case with the affidavit for Ms. Oliver. Her affidavit was not obtained until 2 years and 7 months after the officers signed their affidavit concerning Billy Oliver's (Joseph's brother) statement.

{¶57} Thus, the affidavits and the motion for leave do not contain enough information to conclude that Wilson was unavoidably prevented from discovering the evidence within the prescribed period. However, even if we were to assume that these affidavits do provide clear and convincing proof that Wilson was unavoidably prevented from discovering evidence that Joseph Oliver was actually the shooter, Wilson still has another problem to overcome – the delay from discovering the evidence and filing his motion for leave. While Crim.R. 33(B) does not provide a specific time limit in which defendants must file a motion for leave to file a delayed motion for new trial, many courts have required defendants to file such a motion within a reasonable time after discovering the evidence. *State v. Griffith,* 11th Dist. No. 2005-T-0038, 2006-Ohio-2935, ¶ 15. *See also State v. Berry,* 10th Dist. No. 06AP-803, 2007-Ohio-2244, ¶ 37; *State v. Willis,* 6th Dist. No. L-06-1244, 2007-Ohio-3959, ¶ 20; *State v. Newell,* 8th Dist. No. 84525, 2004-Ohio-6917, ¶ 16; *State v. Stansberry,* 8th Dist. No. 71004, 1997 WL 626063 (Oct. 9, 1997). We agree with this rule and adopt it.

{¶58} As stated above, the first affidavit that implicates Joseph Oliver was made in March 2006. The motion for new trial was not filed until June 2009. That is over three years later. It is true that the trial court could not rule on the motion for new trial while the appeal was pending. However, the appeal process did not begin until March 2008, which was still two years after the first affidavit was signed. Thus, the request for leave was not filed within a reasonable time. Once it became known that Joseph Oliver admitted that he thought he killed Tonya Wilson, Wilson should have filed a motion for leave within a reasonable amount of time. Given the dates of the affidavits, the three year delay in filing the motion for leave is unreasonable.

{¶59} This assignment of error lacks merit. The affidavits lack explanation as to why the evidence could not have been obtained sooner and the request for leave was filed within a reasonable time of discovering the new evidence.

**{¶60}** For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
DeGenaro, J., concurs.